ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of - | ) |
| | ) |
| Metro Machine dba General Dynamics | )    ASBCA No. 62221 |
|   NASSCO-Norfolk | ) |
| | ) |
| Under Contract No. N00024-16-D-4408 | ) |

APPEARANCES FOR THE APPELLANT:     Michael J. Gardner, Esq.
                                         Christopher M. O'Brien, Esq.
                                           Greenberg Traurig LLP
                                         McLean, VA

APPEARANCES FOR THE GOVERNMENT:     Craig D. Jensen, Esq.
                                           Navy Chief Trial Attorney
                                           Philip S. Lazarus, Esq.
                                          Trial Attorney

OPINION BY ADMINISTRATIVE JUDGE PROUTY

This appeal is about the overhaul of a guided missile destroyer that took longer than the delivery order (DO) on the above-captioned contract (the contract) allowed for. The long pole in the tent turned out to be the replacement of a davit and winch used to place a small boat into the water from the deck of the destroyer and to pluck it out. The repair of old parts and installation of new ones by appellant, Metro Machine's (NASSCO's), subcontractor, Advanced Integrated Technologies (AIT), didn't go well and AIT had to repair some of its work and its own subcontractor on the job wound up supplanting it at the end. The work was thus completed late, providing the basis for the Navy to impose liquidated damages, which it did and which NASSCO challenges here.[1] As the reader might have surmised: NASSCO[2] blames the Navy for the davit problems, arguing that the contractual requirement that it (AIT, actually) subcontract with the davit's original equipment manufacturer (OEM) for certain work made the Navy responsible for any problems AIT had with the OEM and that when the OEM was not available, it was the

---

[1] The parties elected to proceed under Board Rule 11, in which there is no hearing and we decide the merits of this dispute on the basis of the written record.

[2] The appeal here is not technically a pass-through claim by AIT since the challenged liquidated damages were assessed against NASSCO; nevertheless, the advocacy often reads as if it were being advanced by AIT (NASSCO is sometimes presented in its briefs as an objective third party, rather than as an interested party to the lawsuit). In any event, we refer to arguments as being made by NASSCO herein, even if they appear to be advanced by AIT.

Navy's responsibility to oversee AIT's work and save it from its own mistakes; the Navy blames NASSCO and AIT.  The Navy argues that this dispute was already largely resolved by means of a bilateral change order which (says the Navy) constituted an accord and satisfaction.  Unfortunately for the Navy, the "bilateral" change order in the record is signed only by the Navy, effectively stopping this defense in its tracks.  Nevertheless, the delays were the responsibility of AIT and thus NASSCO, not the Navy.  NASSCO has also challenged the use of the liquidated damages clause that it had agreed to, but we find it to have been proper.

FINDINGS OF FACT

I.  Preliminaries:  the Contract and the DO

A.  The Contract

The contract at issue in this case is a multiple award task order contract (MATOC)[3] for the maintenance, modernization, and repair (also referred to as "overhaul" herein) of U.S. Navy warships (specifically, guided missile destroyers and cruisers) at the Navy's Mid-Atlantic Maintenance Center, located at Naval Station Norfolk in Norfolk, Virginia (R4, tab 1.1 at GOV 1, GOV 18-19[4]).  It consisted of a base year and four option years, and the DOs could be issued in either firm-fixed-price or cost-plus-fee varieties (*id*. at GOV 2-10).  The contract was awarded to NASSCO on February 17, 2016 (*id*. at GOV 1).

One set of contract provisions sets forth procedures to follow if, in the midst of the overhaul, the contractor finds more work that needs to be done on a ship than originally planned for.  That section in the Statement of Work begins in Section 3.0 and goes through Section 3.5.  (R4, tab 1.1 at GOV 22-23) Section 3.1, "Identification of Condition Found," requires the contractor to notify the government of "needed repairs" and to recommend corrective action for issues not identified in the original DO.  It specifies the contractor should make notification to the government within one day of discovery, to be later followed by a more detailed "condition found report" (CFR) including the contractor's recommendations.  (*Id*. at GOV 22)  The contract also incorporated by reference the Federal Acquisition Regulation's (FAR's) firm-fixed price Changes clause, FAR 52.243-1, (AUG 1987) (*id*. at GOV 68).

---

[3] A MATOC involves awards to numerous bidders who are available to perform individually-assigned task orders or DOs on the contract.

[4] The documents in the Rule 4 file and its supplement that were submitted by the government are all stamped with a Bates number beginning with "GOV" and including zeros when the number is otherwise less than four digits long.  We cite to these Bates numbers but omit the unnecessary zeros.

B. The DO

On August 18, 2016, the Navy awarded DO 0006 (the DO) to NASSCO in the amount of $14,854,857 (R4, tab 1.2 at GOV 90). The DO was for the overhaul of the *USS Bulkeley*, a guided missile destroyer (*id.* at GOV 92-93). The lion's share of the work for the DO fell under contract line item number (CLIN) 0001 (*id.* at GOV 109). CLIN 0001 had a number of sub-CLINs (denoted as SLINs) beneath it, which included SLIN 0001BA (*id.*). One of the many "work items" set forth in SLIN 0001BA was 583-11-001, "Boat Handling Equipment; repair" (*id.* at GOV 112). This is the work that is the focus of this appeal and we will discuss it more at length below. The cost of this work, to be performed by NASSCO's subcontractor, was set by NASSCO at $334,975 (R4, tab 1.3 at GOV 139).

The delivery date for SLIN 0001BA (and for every SLIN for which a delivery date was applicable) was February 17, 2017 (R4, tab 1.2 at GOV 121-22). The DO included a liquidated damages clause in the event that the work on the *Bulkeley* was not completed when specified by the DO. That clause, located in tab 1.2 of the Rule 4 file, at GOV 122, includes, verbatim, the clause set forth in FAR 52.211-11, Liquidated Damages – Supplies, Services, or Research and Development (SEP 2000), filling in the blank for the rate at $32,675 per day. Underneath the FAR clause, the DO includes a paragraph that is unique to the DO, explaining that the $32,675 number was derived from the daily salary of the sailors and officers on the *Bulkeley* and that the total amount of assessed liquidated damages would be limited to 10% of the value of the DO (R4, tab 1.2 at GOV 122).

The liquidated damages clause also provides that NASSCO will be excused if the delay is not its fault as fault is defined by the contract's default clause (*see* FAR 52.211-11(c) as quoted in R4, tab 1.2 at GOV 122). The DO refers to the applicability of the default clause found in FAR 52.249-8, Default (Fixed Price Supply and Service) (APR 1984) (*see* R4, tab 1.2 at GOV 123), and this default clause is incorporated into the contract (*see* R4, tab 1.1 at GOV 68). This clause generally holds the contractor responsible for the defaults of its subcontractors "at any tier" unless they be excusable. *See* FAR 52.249-8(c), (d).

The DO includes a clause providing that only the contracting officer (the CO) is authorized to approve changes in the contract's requirements (R4, tab 1.2 at GOV 105).

Of note, because NASSCO makes an argument about it, SLIN 0001BA contains work item 982-31-001, "Dock Trial, Fast Cruise, and Sea Trial; accomplish" (R4, tab 1.2 at GOV 113).

3

Also of note, in late August, 2016, the parties agreed to a bilateral modification to the DO, adding work and increasing the contract price by to $16,017,900, though leaving the completion date at February 17, 2017 (R4, tab 2.1).[5]

## II. What was Required by the Boat Handling Equipment Repair Work Item

The original version Work Item 583-11-001, "Boat Handling Equipment; repair" (the Work Item or the WI), may be found at tab 4.37 of the Rule 4 file. This is known as the "QG" version.[6] As explained below, it would later be replaced by the "VG" version, to be found at tab 4.38 of the Rule 4 file, but it is helpful to discuss the original version, which we do below. We will point out any changes made by the VG version where appropriate.

The original version of the Work Item identified the items that made up the boat handling system. Of note to our dispute, this included a "Slewing Arm Davit (SLAD) Assembly," a winch assembly, and a control panel (R4, tab 4.37 at GOV 460). The work required pre-repair testing; the removal of the entire system from its foundation on the ship and its transport to the contractor's facility for work; the inspection, repair and replacement of certain parts; re-installation of the system on the ship; and post-repair testing (*id*. at GOV 461-70). Section 3.1.1 required the use of a technical representative of North American Crane and Equipment (the OEM) to perform and oversee much of the work:

> Provide the services of a North American Crane and Equipment Manufacturer Technical Representative to perform pre-repair testing, condition assessment, repair oversight, final adjustments and operational load tests of equipment listed in 1.3.

(*Id*. at GOV 461) The Work Item also included contact information for the "known source" for the technical representative "listed in 3.1" for "North Pacific Crane Company" (NPCC) (*id.* at GOV 471).[7] North American Crane and Equipment is the

---

[5] The change order in the Rule 4 file is a copy that is unsigned by NASSCO, but there is no dispute that it was agreed upon by both parties. This will be an all too common occurrence in this appeal.

[6] As those who routinely deal with the Navy well understand, its use of terms is oftentimes obscure to the uninitiated. A "Q" test requires verification and documentation from a qualified technical representative; the requirements of a "V" test are satisfied by the presence of a qualified tradesperson, trade supervisor, or inspector (R4, tab 4.34 at GOV 440).

[7] We note that this refers to Section 3.1, rather than Section 3.1.1, in which the Work Item sets forth the requirement for a manufacturer's technical representative

4

company that manufactured the davit and NPCC is essentially the same company (*see* R4, tab 4.44 at GOV 497).

## III. Performance

NASSCO subcontracted with AIT to perform all of the work on the boat handling equipment repair for the DO through a purchase order dated September 23, 2016 (*see* R4, tab 3.4 at GOV 188; app. supp. R4, tab A-52).[8] Shortly before the purchase order was issued to AIT, but in plain anticipation of it, AIT reached out to NPCC to obtain an estimate for the work its technical representative would perform. NPCC estimated that for its role in the inspection and removal of the SLAD, its re-installation, and the load test, it would charge $1,475 per day plus marked-up travel and living expenses for the technician. It anticipated that inspection and removal would take six days while the re-installation and load test would be about the same, though perhaps shorter by a day or two. (App. supp. R4, tab A-5 at 81[9]) On September 30, 2016, AIT issued a purchase order to NPCC for the six days of work necessary to inspect and remove the SLAD. This purchase order did not encompass the technician's involvement in the re-installation and testing of the repaired SLAD. (*See id.* at 82)

The *Bulkeley* entered its period of "Selected Restricted Availability" (SRA)[10] and contract period of performance began on October 17, 2016 (*see* R4, tab 2.2 at GOV 153 (referencing period of performance); R4, tab 4.32 at GOV 424, tab 4.33 at GOV 427).

## A. The Pre-Repair Test

The WI required a test of the SLAD using the *Bukeley*'s rigid hull inflatable boat (RHIB) before the SLAD was removed from the *Bulkeley* so that any previously

---

(Section 3.1 does not refer to a technical representative (*see* R4, tab 4.37 at GOV460)) and that the technical representative in Section 3.1.1 is from North American Crane and Equipment, rather than North Pacific Crane Company. These differences are not significant.

[8] Both parties agree that AIT and NASSCO entered into this subcontracting arrangement, though neither cites to the actual subcontract in the record (*see* app. br. at 10; gov't br. at 14) and we have not seen it in the record.

[9] NASSCO's supplemental Rule 4 file has no Bates numbers, though the tabs are bookmarked in the large pdf files that comprise them (AIT submitted its supplements in three batches). Our citations to page numbers are the pages in the larger pdf files. Thus, for example, the first page following tab A-2 in appellant's supplemental Rule 4 file, would be page 33.

[10] Our understanding from the context of its use is that the SRA is the period that a warship is taken out of regular service with the fleet and is available for depot repairs and overhaul.

undiscovered problems with the SLAD might be identified and addressed (R4, tab 4.34 at GOV 437, GOV 441). As noted above, under the QG version of the WI that was applicable when performance began, the technical representative of the OEM, NPCC, was required to be present during the test. The test was scheduled by NASSCO to occur sometime between November 8 and November 22, 2016 (R4, tab 4.34 at GOV 435, 437). NASSCO asserts in its brief that the date of the test was moved up to October 14, 2016 at the direction of the Navy (app. br. at 11 ¶¶ 31-32 (citing R4, tab 3.7 at GOV 212-15)). The cited portion of the record does not support this finding. We read it to indicate when the SLAD test and others would be conducted in light of changes to the schedule, without any indication of which entity changed the schedule (*see* R4, tab 3.7 at GOV 212-15).[11] Indeed, because the opening email in this discussion was one from Navy personnel making sure that the Navy didn't 'drop the ball' in light of the schedule changes (*see id*. at GOV 215), we read it, more likely than not, to indicate that it was the Navy that was reacting to NASSCO's decision, rather than the other way around.

On October 13, 2016, NASSCO submitted "condition found report" (CFR), number 133, to the Navy, informing it that it would be unable to complete the pre-repair test of the SLAD before the RHIB was taken off the *Bulkeley* for its own repairs because the NPCC representative would not be available during that time period. The CFR requested that NASSCO be allowed to conduct the VG version of the test (which did not require the presence of the NPCC representative), instead. After some staffing of the request, Mr. Tony Stevens, the Navy's project manager for the *Bulkeley* overhaul, approved it, and directed the issuance of a no-cost modification to the contract to permit NASSCO to perform the VG version of the test. (R4, tab 4.2, tab 4.34 at GOV 435, GOV 437-40)[12] He did this through Request for Contract Change (RCC) 45G (R4, tab 4.34 at GOV 437-38). This RCC was more formally adopted by the Navy in Contract Modification 1C (Mod 1C) with an effective date of November 16, 2016, though signed by the CO on January 11, 2017 (*see* R4, tab 2.2 at GOV 151-56). Though titled a bilateral modification, the document that the Navy placed into the record is missing a signature on behalf of NASSCO (*id.* at GOV 151).

Mr. Stevens approved the change in the procedure because he perceived the schedule risk of waiting until the NPCC technical representative was available to be far more significant than any risks that would be incurred by the operation of the SLAD without the presence of the technical representative. Indeed, Mr. Stevens perceived the pre-repair test as a very simple test. (R4, tab 4.34 at GOV 438) Given the fact that the

---

[11] To be sure, October 14, 2015 is a few days before the original POP was set to begin and just before the formal beginning of the *Bulkeley*'s SRA, but just because the Navy permitted work to begin early does not mean it was the party that required it.

[12] The no-cost modification was actually approved by the parties on November 2, 2016, with the cost sheet having been prepared by NASSCO on October 25, 2016 (R4, tab 4.39 at GOV 490).

6

test appears to be a simple matter of the routine operation of the SLAD as intended when the *Bulkeley* was at sea or port, we find it hard to disagree. Moreover, there was absolutely no contemporaneous complaint in the record from AIT or NASSCO that the prospect of completing the work without the presence of the technician would be to its prejudice. To the contrary, this was AIT/NASSCO's idea and request.

It is not so clear, moreover, that NPCC's technician truly was unavailable to attend the pre-repair test as AIT had claimed then and NASSCO asserts now. The NPCC technician who ultimately was involved in the SLAD work, Mr. Gareth Thompson (who also was the individual who prepared the cost estimate to AIT on behalf of NPCC), stated in a declaration prepared for this appeal that AIT had never, in fact, requested his appearance for the pre-repair test and further averred that he would have been available in October 2016 were he requested (R4, tab 4.35 at GOV 449). In its own rebuttal affidavit, executed by Mr. Carl Spraberry, the founder and president of AIT, NASSCO directly disputes Mr. Thompson's assertions (*see* app. supp. R4, tab A-53 at 127-28). Mr. Spraberry's affidavit, however, is short on specifics regarding AIT's efforts to secure an NPCC technician and is directly contradicted by some of the evidence it cites. To be sure (as Mr. Spraberry notes), AIT's September 30, 2016 purchase order does seek the services of an NPCC technician for the pre-repair test, but there is no evidence of follow-up on the part of AIT actually seeking to schedule the attendance of Mr. Thompson or another employee of NPCC – certainly not before the October 13, 2016 CFR in which NASSCO stated that the NPCC technician was unavailable.[13] Indeed, the first correspondence in the record from AIT to NPCC after the purchase order is dated October 28, 2016, and is an email from Mr. Earl Proetzel of AIT to NPCC titled, "USS Bulkeley – Need your techs qual letter ASAP." The text of the letter was short: "We've asked ten times with no response. Navy needs your letter before we can begin repairs." (App. supp. R4, tab A-1 at 14) Mr. Thompson responded shortly thereafter on the same day, apparently providing the required letter (*id*. at 15). NASSCO provided no evidence of the "ten" previous attempts to obtain that letter from NPCC. NASSCO did include its own

---

[13] NASSCO, in fact, submitted an earlier affidavit from Mr. Spraberry in which he stated that the test was originally intended to be on October 7, 2016 – a week earlier – and that the Navy had moved it to the later date with no prior notice (app. supp. R4, tab A-39 at 294-95 ¶ 11). That is the general tenor of its brief as well (*see* app. br. at 10-11). If this is accurate, it undercuts NASSCO's current suggestion that the problem was that the Navy made the test earlier than planned and that was why the NPCC representative could not attend. If the test was supposed to be on October 7 and October 7 is when the Navy changed the date of the test, presumably, NPCC's representative would have been present on that date. There is no evidence that this was even contemplated. Mr. Spraberry's statement in the same affidavit that "we reached out to NPCC" on or about October 10, 2016 to determine whether they could perform on that date (app. supp. R4, tab A-39 at 295 ¶ 12) appears second-hand and without the supporting documents we would expect.

7

internal email traffic just before the October 28 email to NPCC. On October 26, 2016, the NASSCO project manager, Mr. Maurice ("Moe") Adams, emailed Henry Bose and others at NASSCO that he was having trouble with AIT which, according to Mr. Adams, had not yet been in touch with NPCC and had conveyed to him that they did not know when they would be able to talk with the NPCC representative (*id*. at 12-13). This email was forwarded to Mr. Spraberry who, in turn, forwarded it to Mr. Proetzel who responded to Mr. Spraberry by criticizing Mr. Adams as "not a strong [project manager]" and stating that "Joe" (presumably Joe Croteau, the production manager from AIT) had already reached out to NPCC and been told that the technician was "booked" with other matters, but that AIT should go ahead and disassemble the SLAD[14] (*id*. at 12). Mr. Spraberry's affidavit also cites an email from Mr. Croteau in support of the notion that AIT had made attempts to schedule the NPCC technician without success (app. supp. R4, tab A-53 at 127 (citing, *inter alia*, app. supp. R4, tab A-19)). The email, however, places the blame for the NPCC technician's unavailability squarely on NASSCO, with Mr. Croteau stating, "NASSCO prematurely set up the (Q)(G) paragraph 3.2 checkpoint without giving us enough time to contact the OEM . . ." (App. supp. R4, tab A-19 at 210).[15] In light of the lack of specificity and first-hand knowledge on the part of Mr. Spraberry, and Mr. Croteau's blaming NASSCO for setting the pre-maintenance test before he could contact NPCC, we conclude that, more probably than not, AIT made no real effort to secure the timely attendance of an NPCC technician for the pre-repair test or, for that matter, for the disassembly of the SLAD.

AIT performed the pre-repair test twice, as required by the VG version of the WI, on October 25, 2016 (R4, tab 4.34 at GOV439), which would have been just before the email string discussed immediately above.[16] Nothing of particular note appears to have

---

[14] There is some slight support for this in the record in the email from Mr. Croteau to Mr. Spraberry, dated October 26, 2016, which we discuss immediately below, in which Mr. Croteau states that he had "called the tech rep yesterday" and been told by the NPCC representative that he did not need to be present for removal of the SLAD. Mr. Croteau also said that he had been trying to get the representative's credentials for the prior three weeks, without success. (App. supp. R4, tab A-19 at 210)

[15] This email also supports our earlier finding that it was NASSCO/AIT which moved the SLAD pre-operation test to mid-October 2016, and not the Navy.

[16] NASSCO's brief asserts that the Navy performed the test, itself, on October 14, 2016, but this assertion is supported by no reference to the record (*see* app. br. at 11 ¶ 40). We independently came across evidence to support this, however, in the affidavit that Mr. Spraberry executed in this matter (*see* app. supp. R4, tab A-39 at p. 295 ¶ 13). In the case of the dueling affidavits, we find it more likely than not that the test was performed the same time that the documents were drafted which indicated the problems with the SLAD (that is, October 25) – certainly it would not reflect well upon AIT if it waited two weeks to draft them, rather than

8

transpired during that test, although the SLAD plainly needed work as reflected in CFR 267, dated October 27, 2016, which forwarded to the government an AIT report, dated October 25, 2016, detailing several apparent issues with the SLAD, which were presumably noted in the pre-repair inspection and test (R4, tab 4.6 (the CFR), tab 4.4 (the AIT report attached to the CFR)).

### B. Removal of the SLAD and Work on it at AIT

At some point after the October 25, 2016 test,[17] the SLAD was removed from the *Bulkeley* and moved to AIT's nearby facility. NPCC's Mr. Thompson visited on December 13, 2016 to perform a "condition assessment" and observed a completely disassembled crane (R4, tab 4.35 at GOV 446, GOV 450). While there, he performed his own evaluation of the state of the equipment and wrote a report about it (*id.* at GOV 450). This report was made part of CFR 753, submitted by NASSCO to the Navy (*see* R4, tab 4.11 at GOV 336 (the CFR), tab 4.10 at GOV 323-35 (the report)). In general, the report depicts a heavily corroded and poorly maintained SLAD that was in "pretty bad shape" and required substantial refurbishment (*see* R4, tab 4.10 at GOV 323-26).

While at AIT, Mr. Thompson also noted the parts that had been delivered by NPCC to AIT as part of their contract and found that they were complete (R4, tab 4.35 at GOV 446) (this will be important later). Though he was in Norfolk the following week to work on the SLAD for a different Navy destroyer, AIT declined his offer to oversee their repair work on the *Bulkeley*'s SLAD. Mr. Thompson states in his declaration that AIT told him that it declined his offer to oversee the repair work due to budget concerns. (*Id.* at GOV 446, GOV 450) AIT denies this, but does not provide an alternate reason for eschewing his services (app. supp. R4, tab A-53 at 127-28). Thus, we find it likely that the expense of consulting with Mr. Thompson played a part in AIT's limited use of him.

One subject of importance that arose during Mr. Thompson's condition assessment during his initial visit was the state of the control console used to operate the SLAD. It had problems, as noted in AIT's initial October 2016 report (*see* R4, tab 4.4) and Mr. Thompson's December 2016 report (*see* R4, tab 4.10 at GOV 324), and it was

---

completing them contemporaneously with the test. In the end, for our purposes, it does not particularly matter if the test were held on October 14 versus October 25.

[17] NASSCO has provided a chronology of events in its supplement to the Rule 4 file which states that the "SLAD boom and console" were removed from the "Buckeley" [sic] on October 20, 2016 (app. supp. R4, tab A-52 at 100). That would be inconsistent with the October 25, 2016 date of the test. It would also be inconsistent with Mr. Proetzel's email dated October 26, 2016 which referenced the removal of the SLAD being planned in the future (app. supp. R4, tab A-1 at 12).

agreed that it should be shipped back to NPCC on the West Coast for its own overhaul. (R4, tab 4.35 at GOV 446)

Following the submission of CFR 753, the Navy issued a contract modification (Mod 03), which incorporated RCC 172, a request for contracting change that encompassed the extra work on the SLAD recommended by CFR 753 (*see* R4, tab 2.3 at GOV 161 (incorporation of RCC 172 in entry number 583-11-001), tab 4.33 at GOV 431 (identifying scope of RCC 172)). The terms of RCC 172 were agreed to by the parties on December 28, 2016 (R4, tab 4.33 at GOV 431). Mod 03, which was effective February 1, 2017, but actually executed by the CO on March 1, 2017 (R4, tab 2.3 at GOV 157) also extended the time to complete DO 6 from February 17, 2017 to March 21, 2017 (*id.* at GOV 158). For unknown reasons, Mod 03 was not executed by NASSCO – or at the very least, the copy of the modification provided by the government does not include the signature of any person on behalf of NASSCO (*id.* at GOV 157). That does not mean, however, that we entertain any doubt that NASSCO agreed to its general terms about the increases in work, time to complete the job (which reflected NASSCO's proposal), and payment. Notably, NASSCO presents no evidence that any of these things were in dispute at the time.

### C.   Re-Installation of the SLAD and Things go Downhill Quickly

At some point prior to February 15, 2017, the console, which had been shipped to NPCC for overhaul as planned, was returned; AIT performed the remainder of the shop work on the SLAD; and the SLAD was re-installed on the *Bulkeley* by AIT.[18] Mr. Thompson was present on AIT premises on February 15, but was unable to board the *Bulkeley* because, apparently, AIT and/or NASSCO had not secured security permission from the Navy to allow his presence (R4, tab 4.41 at GOV 494). The console controlling the SLAD was not installed on the *Bulkeley* until March 8, 2017 (R4, tab 4.36 at GOV 456).

#### 1.   The Console's "Mother Board" Gets Fried by AIT

AIT had asked Mr. Thompson, around the time of his February visit, to return to Norfolk by March 5, 2017 for the operational test of the SLAD, and he had agreed to change his plans to make that happen (app. supp. R4, tab A-35 at 280). On March 3, 2017, AIT submitted a CFR to the Navy, informing it that Mr. Thompson would not be available until March 15, 2017 and proposing that a Navy technical representative perform the duties usually performed by the OEM pursuant to paragraph 3.1.1 of the

---

[18] NASSCO's Request for Equitable Adjustment (REA) alleged that this all happened on February 14, 2017 (R4, tab 3.4 at GOV 189) and there is other evidence in the record supporting a finding that it happened about that time (app. supp. R4, tab A-19 at 203). There is no reason to question this.

WI.[19]  Mr. Stevens of the Navy responded to the CFR on March 8, 2017, stating that it was "unsat" that the OEM technical representative would not be there, and that there should be a credit to the Navy for the contractor not doing what the WI required of it.[20] He further noted that the Navy's supervision "will be available for oversight only and will not replace the OEM."  (R4, tab 4.18)  The record does not reflect why Mr. Thompson was unavailable or when he would have informed AIT of the problem, although one of Mr. Spraberry's declarations states that it was on or about March 3 (*see* app. supp. R4, tab A-39 at 297).  The evidence is that he was first on the *Bulkeley* for this trip on March 9, 2017 (R4, tab 4.36 at GOV 456).

On March 8, 2017, AIT installed and powered up the new SLAD control console on the *Bulkeley* without Mr. Thompson's involvement and contrary to his advice that it not be wired and energized without him being present (*see* R4, tab 4.35 at GOV 447, tab 4.36 at GOV 456; app. supp. R4, tab A-35 at 280 (email from Thompson telling AIT that if the SLAD were powered up in his absence, it would void the NPCC warranty), app. supp. R4, tab A-47 at 52).  Mr. Thompson came onto the *Bulkeley* the next day and observed wiring problems, which he addressed with an AIT employee (R4, tab 4.35 at GOV 447).  Mr. Thompson alleges that he was told by the AIT employee who installed the system that he was not a qualified electrician, but that he did not feel that he needed to be to do the job (R4, tab 4.35 at GOV 451).  Although NASSCO insists that the system was not energized prior to Thompson's arrival[21] (*see* app. br. at 16 (stating that the system was energized on March 9); app. supp. R4, tab A-39 at 297), the balance of the evidence shows that this is wrong:  Mr. William Paetz's declaration, based on his contemporaneous notes, reflects that not only was the console energized on the 8th of March, but that it caused a "ground" fault that was detected by *Bulkeley* personnel.  The AIT personnel on-site denied that the ground was related to the SLAD, but *Bulkeley* personnel and the Port Engineer (Mr. Paetz) proved it to be a problem with the SLAD by isolating it through a circuit breaker.  When Mr. Paetz looked at the wiring of the control panel that day, he saw that it was all white wires (similar in description to what Mr. Thompson noted on his investigation the next day) with no diagrams to show where the different leads belonged.  (R4, tab 4.36 at GOV 456)  Mr. Thompson also stated in his declaration that it had been energized the day before his March 9 arrival (R4, tab 4.35 at GOV 447).  NASSCO argues that a statement in Mr. Thompson's declaration that he

---

[19] We quote paragraph 3.1.1 verbatim earlier in the Facts section of this decision.  It does not detail exactly what the oversight duties of the OEM are for the SLAD and console installation (*see* R4, tab 4.37 at GOV 461).

[20] There is no evidence in the record that the Navy ever attempted to obtain this credit.  Mr. Stevens, it appears, was just upset.

[21] In its brief, NASSCO asserts that it was the Navy which energized the panel on March 9 (*see* app. br. at 16).  This assertion is not supported by the portion of the record cited by NASSCO's brief (*see* R4, tab 4.34 at GOV 443, *cited by* app. br. at 16), nor anywhere else in the record that we encountered.

11

had opened the panel on March 9, so that he could disconnect it if there were a problem when it was energized means that he was the first one to energize it and did so on that date (app. reply br. at 11, 22), but this is incorrect. In context, it is clear that Mr. Thompson had expected to energize the system when he arrived (consistent with his advice to AIT) and only discovered the truth after he opened the panel. (R4, tab 4.35 at GOV 447)[22]

Unfortunately, because the wiring had been done incorrectly (with a 110 Volt alternating current lead being wired to a 24 Volt direct current portion of the card (*see* R4, tab 4.35 at GOV 447)) and the system energized the previous day, the "mother board" on the console was already damaged beyond easy repair. NASSCO issued a corrective action request (CAR) to AIT to fix the problem with the console and to find the root cause. AIT's response to NASSCO alleged that its electrician re-wired the console without the assistance of the NPCC representative because of scheduling problems making Mr. Thompson unavailable. It further alleged that NPCC had failed to provide it new directions for installation. That said, under the heading, "Preventative Action," AIT stated that " . . . AIT Marine will take additional measures when utilizing an OEM or technical representative required by a work item. Scheduling will be addressed as a priority and additional oversight is to be included when working with technical representatives." (App. supp. R4, tab A-18 at 193) NASSCO's investigation of the matter put the blame on AIT, stating that that the AIT "[w]orker failed to obtain any updated electrical drawing or schematics from" NPCC (app. supp. R4, tab A-23 at 221).[23] Thus, though NASSCO argues today that the damaged mother board was NPCC's fault, in its internal correspondence, NASSCO concedes that AIT improperly installed the console and damaged it, which is our finding as well.

The damage to the console's mother board required its replacement. Although Mr. Thompson and AIT worked together in the days after the problem was diagnosed in an effort to fix the motherboard,[24] and the parties searched for an available substitute,

---

[22] Included in NASSCO's supplement to the Rule 4 file is a chronology of events that puts this installation at March 9, 2017 (app. supp. R4, tab A- 52 at 113), but there is no identification of who wrote this or its basis and it is thus unpersuasive.

[23] The NASSCO author of the report had significant enough concerns to recommend "an audit of current AIT jobs for proper workmanship" (app. supp. R4, tab A-23 at 221).

[24] Mr. Thompson's daily fee went up to approximately $5,000 at this point (app. supp. R4, tab A-29 at 263-64). NPCC justified this increase due to the need to replace him on other projects so as to deal with the emergency on this one (*id*.; R4, tab 4.44 at GOV 498). Whether or not it was justified is beyond the scope of this appeal, but it cannot have been good for their relationship and, indeed, there is evidence from NASSCO that AIT withheld full payment on those invoices (app. supp. R4, tab A-26 at 241).

including the possibility of taking one from another Navy destroyer that was in port (*see* R4, tab 4.36 at GOV 456; app. supp. R4, tab A-17), those attempts failed and it was ultimately decided that they needed another one to be fabricated by NPCC (R4, tab 4.34 at GOV 443, tab 4.36 at GOV 456). NPCC did not have a board that was identical to the one that had been damaged, but had an upgraded console which the Navy paid for (since it was an upgrade), though it was agreed that NASSCO would absorb the cost of installing it (R4, tab 4.34 at GOV 443).

At some point later in March 2017, NASSCO issued a stop work order to AIT and directly hired NPCC to complete the work on the SLAD, apparently jointly with NASSCO personnel (R4, tab 4.34 at GOV 443). The console was repaired on about March 20, 2017 (*id*. at GOV 443).

2. More Problems Arise: the Brakes and Others

On March 16, 2017, NASSCO submitted CFR 376, informing the Navy that there was a rust hole on the SLAD's brake actuator cylinder which would prevent it from being ready for sea trials the next day, and requesting a contract extension to repair it. Mr. Stevens denied the request, stating that the Navy would obtain a replacement part with an "RTR" (apparently using the Navy's own replacement stocks) and that this issue would not hold up the sea trials, considering the fact that the "electrical issues" were the problem holding up the SLAD work. (R4, tab 4.21) Indeed, as noted above, the electrical issues were not resolved until March 20, which mooted the notion of sea trials on March 17, and this CFR is the last place in the record that we see any discussion of the hole in the brake actuator cylinder being a potential cause for delay.

On or about March 21, 2017, (now that the control panel was repaired) NASSCO and the Navy were running additional tests on the SLAD and discovered that the brake assembly had been improperly installed by AIT and which necessitated its removal and repair (R4, tab 4.34 at 443-44; app. supp. R4, tab A-24 at 230 (NASSCO internal fact finding report)). NASSCO removed the assembly, apparently returned it to AIT for repair, and then re-installed it by April 1, 2017 (R4, tab 4.34 at 443-44). NASSCO's internal "Cause and Corrective Action Form" on the many problems it had with the SLAD attributed the brake assembly problems to the AIT technician having been in a rush when he did the work on it (app. supp. R4, tab A-23 at 221-22).

In addition to the brakes, there were problems during the last weeks of March 2017 with hydraulic hoses leaking and leaks of hydraulic fluid around solenoids. These were repaired by the end of the month. (R4, tab 4.36 at GOV 458)

13

### 3. The Bad Blood Between NPCC and AIT

It is hardly surprising that, by the time NASSCO gave AIT the stop work order and had NPCC complete the SLAD work, NPCC's relationship with AIT had badly deteriorated. Because one of the disputes between them has caused AIT to essentially allege that NPCC was attempting to blackmail it and thus should not be trusted in today's appeal (app. br. at 27; app. reply br. at 23), we will briefly touch upon it.

During his February 2017 visit to the AIT facility, Mr. Thompson observed a number of parts for the SLAD still in their original packaging from NPCC, which indicated that they had not been changed out as expected (R4, tab 4.35 at GOV 446-47). Mr. Thompson took photographs of these parts and shared them with AIT and NASSCO management (*id.*; R4, tab 4.44 at GOV 502-04 (the photos); *see also* R4, tab 4.43 at GOV 496 (e-mail from NPCC dated March 24, 2017 forwarding photos to NASSCO)). He also raised the subject with AIT employees then and there (R4, tab 4.35 at GOV 446-47; *see also* app. supp. R4, tab A-19 at 203, 208 (AIT's perspective)).

Mr. Spraberry states in his affidavit that the extra parts allegations were false, and proven so by a NASSCO investigation, but gives little support for this conclusory statement (app. supp. R4, tab A-53 at 129).[25] That remains NASSCO's position now (*see* app. br. at 17).

A month after the February 2017 visit, and after the wiring issues had come to a head, AIT employees alleged that, during that visit, Mr. Thompson suggested a *quid pro quo*, by which AIT would pay the money it owed to NPCC and Mr. Thompson, in turn, would draft a less damning report about the excess parts he discovered (*see* app. supp. R4, tab A-19 at 202-03). Mr. Thompson, for his part, denies these allegations, stating that he is not involved in "debt collection" or accounting (R4, tab 4.44 at GOV 497). Later in contract performance, NPCC would make allegations to NASSCO that AIT had failed to pay it invoices that were due and payable. A NASSCO employee looked into the matter and reported to his superiors that, for the most part, AIT had paid NPCC its

---

[25] Mr. Spraberry's affidavit references an email from a NASSCO procurement specialist as proof of this (*see* app. supp. R4, tab A-53 at 129 (citing app. supp. R4, tab A-26)). We have reviewed this email and it is primarily about billing disputes between AIT and NPCC (finding that AIT is primarily in the right about them), but conclusory, to say the least, about the parts dispute, merely stating that AIT "has the documentation to substantiate" its claim that Mr. Thompson's assertions on this subject were baseless (app. supp. R4, tab A-26 at 241). Nevertheless, we also note that NASSCO's internal investigation of the situation was summarized in its larger investigation of all of the problems with the SLAD and concluded that all of the parts required to be removed and replaced were, in fact, removed and replaced (app. supp. R4, tab A-24 at 230).

invoices in full except for those it disputed because of the increased rate NPCC charged for Mr. Thompson's services (app. supp. R4, tab A-26 at 241). The Board has no need or inclination to determine who was in the right about the payments between AIT and NPCC as there is no allegation, much less evidence, that they had any bearing on the timeliness of the work, but they underscore the bad relationship between the parties. Similarly, we need not decide who was correct about the excess parts issue except that we have found no basis to question Mr. Thompson's belief that it was a problem and that he was obliged to raise it with AIT.

In any event, the implication from NASSCO on the alleged *quid pro quo* conversation appears to be that Mr. Thompson's greed regarding payments from AIT motivated him to misrepresent matters to the detriment of AIT unless it were willing to make payments. Though we suspect that payments from AIT to NPCC did arise in conversations between AIT and Mr. Thompson in February 2017 (we see them in later emails and in Mr. Thompson's statement that AIT had declined further services from him in December 2016 for money issues), we also suspect that it is exaggerated by NASSCO. Our belief in this exaggeration arises from the fact that AIT did not internally document the alleged threat until a month after the fact, following the serious mutual recriminations regarding the console installation, when we believe such allegations (at face value) are serious enough to have merited immediate documentation, even if only for internal use. Moreover, the only direct evidence before us from any participant in the alleged discussion is Mr. Thompson's declaration. NASSCO has not provided affidavits from any of the individuals who reported the alleged threats. We also believe it is highly unlikely that Mr. Thompson took the photographs of the excess parts in February 2017 with the intention of blackmailing AIT with them: if they did not show what he alleged them to show, the photos would only hurt him and NPCC. Thus, in the end, the allegations regarding the *quid pro quo* demand are not particularly persuasive and do not give us reason to significantly discount Mr. Thompson's written testimony on other matters, even though they underscore the dysfunctional relationship that developed between AIT and NPCC.

IV. The Job is Completed; Liquidated Damages and the Government's Agreement to Limit Them

As noted above, Mod 03 extended the date of contract performance until March 21, 2017. On March 22, 2017, the CO sent to NASSCO a letter formally stating that the work on the *Bulkeley* was incomplete and that NASSCO was incurring liquidated damages at the contractual rate (*see* R4, tab 3.1). There were other problems with the *Bulkeley* overhaul than just the SLAD repairs that are the focal point of this appeal. According to the letter, in addition to the problems with the SLAD, NASSCO had not yet completed work replacing passive countermeasures material that it had damaged while repairing the "Sliding Padeye Tilting;" had not yet completed the replacement of passive countermeasures materials on the bridge wings; and had not yet completed a tabletop

15

repair (*id.* at GOV 177). NASSCO responded to the Navy's letter on March 27, 2017, expressing that it took the matter seriously and that two of the four problems would be remedied by March 28, 2017, while the work on the sliding padeye tilting and the SLAD would be completed on March 31, 2017 (R4, tab 3.2).

According to NASSCO's internal "fact finding" documents, the work on the SLAD was not, in fact, complete on March 31, but troubleshooting for the solenoid valves and hydraulic leaks led to the winch assembly being removed from the SLAD on April 3, 2017 and taken to AIT's shop[26] for repairs.[27] Those repairs were done that day and the assembly was delivered to another contractor for a bench test, in which satisfactory results were obtained after NASSCO made further adjustments. The assembly was re-installed on the SLAD on the *Bulkeley* on April 5, 2017, at which point the Navy deemed the work complete. (App. supp. R4, tab A-24 at 231; *see also* R4, tab 4.34 at GOV 444 (government assertion that work complete on April 5, 2017)) April 5, 2017 was 14 days after March 21, 2017. Effective June 29, 2017, the CO issued a Modification 06 to the DO, assessing 14 days of liquidated damages against NASSCO in the amount of $457,450 total (R4, tab 2.6 at GOV 173-74).

On July 3, 2017, the Navy issued an internal "tasking memo" changing the availability date of the *Bulkeley* to May 9, 2017 to reflect the time that sea trials on the ship were completed. The memo provided that the "POP" (presumably, period of performance) for NASSCO remained "21 March 11" [sic]. (R4, tab 4.32 at GOV 424)

On July 7, 2017, the Navy and NASSCO met to discuss the liquidated damages. The Navy offered to reduce them by three days and to also offset $25,000 in "uncompensated work" from the assessed damages. In an email of that date, NASSCO's Director of Contracts, Wayne Willey, wrote that "NASSCO accepts your offer of a reduction in 3 days damages and $25,000 for uncompensated work for a total of $123,025.00." (R4, tab 3.3) NASSCO has submitted a declaration from Mr. John Anderson, its Senior Director of Business Operations, stating that the reduction in damages was based upon "a Navy calculation error – not due to settlement of this Appeal" (app. supp. R4, tab A-40). Mr. Anderson's declaration does not indicate his relationship to Mr. Willey or the basis of his knowledge about the "settlement" discussion between the Navy and NASSCO, except for the unhelpful conclusory statement that he

---

[26] Though we have previously found that NASSCO generally replaced AIT by NPCC to conclude the work on the SLAD, obviously AIT continued to play some part in the work performed.

[27] NASSCO alleges in its brief that it would have removed the winch assembly two days earlier, but that the Navy held up its use of a barge and a crane because it was unwilling to open the necessary security gates over the weekend without 72 hours' notice (app. br. at 18 (citing R4, tab 4.29)).

had personal knowledge of the matters in his affidavit (*id*.). We have not heard from Mr. Willey.

Ms. Tara Boyd, the administrative contracting officer (ACO) for the Navy, who was present during the discussions (and whose list of attendees does not include Mr. Anderson), states that the discussions between NASSCO and the Navy were conducted with the understanding of both parties that they were undertaken to avoid NASSCO's filing an REA. (R4, tab 4.33 at GOV 433-34)

Fourteen days of liquidated damages at the contractual rate of $32,675 per day minus the three days and the $25,000 offset agreed to by the parties' sums to $334,425. Effective July 7, 2017, the CO issued Modification 07 to the DO, reducing liquidated damages to $334,425. Modification 07 was not executed by NASSCO. (R4, tab 2.7 at GOV 175-76)

On November 27, 2017, NASSCO submitted to the CO a document entitled a Request for Equitable Adjustment, passing through[28] the claim of AIT for the sum of $334,425 (R4, tab 3.4). There was some back and forth between the parties, with the Navy seeking additional information and NASSCO and AIT responding (*see* R4, tabs 3.6, 3.7) and on August 10, 2018, the CO denied the REA (*see* R4, tab 3.9). On June 4, 2019, NASSCO submitted a pass-through claim on behalf of AIT for $334,425 (*see* R4, tab 3.11). On August 16, 2019, the CO issued a final decision denying the claim (R4, tab 3.14). NASSCO has filed a timely appeal.

DECISION

There is much to unpack here. We will address the Navy's accord and satisfaction defense first since it had the potential to limit the scope of the litigation (but it did not). We will then move to the question of whether the Navy, by allowing AIT to proceed without NPCC's presence on certain occasions, took on the responsibility for assuring the quality of AIT's work. It did not. Next, we are presented with the legal question of whether it is the Navy or AIT which must bear responsibility for the wrongs allegedly committed by AIT's subcontractor, NPCC. We find that since AIT, not the Navy, had privity of contract with NPCC, the relationship was AIT's (and thus, ultimately, NASSCO's) responsibility. Even if it weren't, we further find that, as a factual matter, AIT was the party responsible for the many failures in workmanship that delayed the work on the SLAD; not NPCC. Finally, we find that the imposition of liquidated

---

[28] As noted earlier in this opinion, because the challenge before us is to the liquidated damages that the Navy asserted against NASSCO, there is no reason the claim needed to be a pass-through since the costs were, in fact, imposed directly on NASSCO as far as the Navy was concerned even if (as appears to be the case) NASSCO turned around and charged AIT for them.

17

damages was contractually proper and not to be set aside because the *Bulkeley's* SRA was extended by the Navy beyond the contract's period of performance.

I. The Principle of Accord and Satisfaction Does Not Limit the Navy's Potential Liability

The Navy argues that Mod 1C, which changed the terms of the contract to allow the pre-repair test to proceed without the OEM representative present, eliminated any potential liability against the government for the test proceeding in Mr. Thompson's absence (gov't br. at 50-52). This would be a solid argument if the Navy had presented evidence of a bilateral contract modification. Unfortunately for the Navy, as noted earlier in this opinion, the only signatures on the contract modifications that the government submitted for the Rule 4 file were government signatures, leaving us no evidentiary basis[29] to find them to be bilateral. In such circumstances, we cannot find an accord and satisfaction. *See Mil-Spec Contractors, Inc. v. United States*, 835 F.2d 865, 868-69 (Fed. Cir. 1987) (no accord and satisfaction without written bilateral agreement).

II. The Navy's Assessment of Liquidated Damages was Proper

As a general proposition, once the Navy demonstrated that the work was completed late, it was entitled to impose the liquidated damages set forth in the liquidated damages clause and the burden shifted to NASSCO to justify the delay in completing the project. *See Ken Laster Co.*, ASBCA Nos. 61292, 61828, 20-1 BCA ¶ 37,659 at 182,855 (citing *OCCI, Inc.*, ASBCA No. 61279, 18-1 BCA ¶ 37,062 at 180,415); *see also Sauer Inc. v. Danzig*, 224 F.3d 1340, 1345 (Fed. Cir. 2000) (burden on contractor to justify delay).

A. NASSCO was Fourteen Days Late

NASSCO presents no real challenge to the Navy's assertion that the *Bulkeley* was not complete until April 5, 2017 and that the DO, as modified by Mod 03, required its completion by March 21, 2017. That gets us 14 days, though the Navy ultimately only

---

[29] As noted above, we found that NASSCO concurred with these changes since they were consistent with the CFR, and suspect that it would have signed the modification if so requested, but the Navy did not accomplish this. Similarly, the Navy's signal failure to get a NASSCO signature on the compromise that reduced its liquidated damages liability by $123,025 is baffling to us: the email correspondence from NASSCO "accepting" the offer reads very much like it would if a bargain had been struck between the parties, and it would have likely precluded the present litigation.

sought 11.[30]  Nevertheless, we discuss the matter in somewhat more detail because of the Navy's failure to obtain NASSCO's signature on any bilateral modification setting the completion date for March 21 and because, in its reply brief, NASSCO argues that the March 21 date was not reasonable (*see* app. reply br. at 19).  Although the Navy's failure to present a bilateral modification signed by NASSCO prevents it from availing itself of the accord and satisfaction defense for issues preceding the change, under the facts present here, it does not change the fact that March 21, 2017 was the date that completed performance was due.

We reach this result because the Changes clause does give the Navy the right to make unilateral contract modifications changing NASSCO's contractual obligations, so long as NASSCO is adequately compensated for the increased costs and time necessary to complete the contract that it identifies to the CO.  *See* FAR 52.243-1.  NASSCO, which we have found agreed to the terms of Mod 03 even if the Navy did not obtain its signature, made no challenge to is terms, which the Changes clause requires be done in 30 days.[31]  *See* FAR 52.243-1(e).  We further note that March 21, 2017 was a more than adequate amount of time for NASSCO to accomplish the additional work required by Mod 03:  the SLAD and console were ready for re-installation in early March, 2017, and, if not for the missteps in "frying" the mother board, installing the brake assembly wrong, and the hydraulic hoses and solenoids, there is every reason to believe that NASSCO would have had ample time to complete the work by March 21, 2017.

B.   The Navy did not Assume Responsibility for Performing OEM Duties

NASSCO's first argument as to why the Navy should bear responsibility for the delay is that the Navy's "standing in" for NPCC during the pre-repair test and for oversight of the repairs means that it is responsible for all of AIT's errors since the OEM's responsibilities were to ensure that the work was done correctly and obviously

---

[30] Because of this three-day difference, we need not consider whether the delays in making the *Bulkeley* available on the weekend of April 1 and 2 were the Navy's responsibility or not.

[31] The contention that NASSCO makes in its reply brief, that it was given, at most, only 20 days' notice of the new date because that was the date that Mod 03 was signed (*see* app. reply br. at 19), is misleading, to say the least.  To be sure, this project was bedeviled by the fact that the paperwork was often a trailing item, but, as we found above, the parties actually agreed to the additional work and the timeline that was reflected in Mod 03 in December 2016 (AIT would certainly not have ordered the new console without the Navy's agreement to pay for it).  The absolute lack of contemporaneous complaint by NASSCO over the imposition of the March 21, 2017 completion date only underscores this – a lack of complaint that carried over into the talks where the Navy reduced the liquidated damages by three days.

19

the Navy didn't save it from its errors (app. br. at 22-24). This argument is as mistaken as it is overreaching, for it completely ignores what AIT/NASSCO requested the Navy to do; what the Navy agreed to do; and who bears responsibility for contractual performance. It also misapprehends the burden of proof: once the Navy proved that NASSCO was late in completing the contract, the burden of proof shifted to NASSCO to prove that the delay was caused by the Navy.

1.    The Pre-Repair Test

First, as to the pre-repair test, the Navy did not agree to perform the duties of OEM. To the contrary, the request from NASSCO which the Navy granted was for NASSCO to be freed of its contractual obligation to have the OEM present and to have a lesser amount of supervision – the VG test. NASSCO does not cite to any portion of the record where the Navy affirmatively undertook to provide the kind of oversight that the OEM would provide, nor does it provide any evidence that the Navy undertook to be the guarantor of the quality of AIT's work because it did no such thing.

Another fatal evidentiary shortcoming to this allegation is that NASSCO fails to offer any evidence that, even if a qualified technician were performing the OEM technician's responsibilities at the test, it would have made a material difference to the many missteps that AIT made *afterwards* which delayed the installation of a functioning SLAD. Indeed, NASSCO's own internal reports lay the blame on AIT, not the Navy, for the many missteps in the re-installation of the SLAD and not a single one that we have encountered alleges that the failure of the OEM representative to be present at the pre-repair test (or of a Navy technician acting like an OEM technician) led to any of AIT's later problems. NASSCO asks us to ignore the particular facts presented in its reports (indeed, it is silent about them) and, instead, to look to Mr. Thompson's statement[32] that his presence at the pre-repair test was important and would help identify issues that were later encountered (app. br. at 22 (citing PFOF 108, which, in turn, cites R4, tab 4.35 at GOV 452)). There are a number of problems with this approach, not the least of which is that Mr. Thompson made no statement regarding the pre-repair test on the page of the declaration cited by NASSCO (*see* R4, tab 4.35 at GOV 452). Where he *did* discuss the consequences of his absence from the pre-repair test, he stated that his absence from the pre-repair test made his condition assessment of the SLAD system less effective because it is hard to diagnose problems without seeing it in action (R4, tab 4.35 at GOV 450). This is undoubtedly true, and consistent with common sense, but it has

---

[32] We cannot help but observe that NASSCO's hanging its figurative hat on Mr. Thompson's declaration here is inconsistent with its general disagreement with most of what he has testified to, with NASSCO stating most clearly in its reply brief that, "Mr. Thompson's declarations are contradictory, inconsistent with the record, and reference matters irrelevant to the present claim. . . . NASSCO materially disagrees with [their] contents." (App. reply br. at 6)

nothing to do with AIT's mis-wiring of the control panel; sloppy installation of the brakes, and the other defects in its workmanship that led to the delay, and NASSCO has presented no evidence that it did.

To the extent that NASSCO is obliquely arguing that the Navy's alleged re-scheduling of the test, which prevented Mr. Thompson's presence, is the issue, we find this also less than persuasive. We found earlier in this opinion, as a matter of fact, that AIT made no real effort to obtain Mr. Thompson's presence for the pre-repair test and that there is considerable uncertainty over who scheduled the test and whether there was any objection by NASSCO to the schedule which gave it more time to work on the SLAD and reduced its out-of-pocket costs by eliminating its obligation to pay for Mr. Thompson's presence. NASSCO cannot use the changed schedule of the pre-repair test as the basis for offloading the responsibilities of the OEM representative to the Navy. Moreover, this argument would suffer from the same evidentiary deficiencies that plague NASSCO's argument that the Navy assumed responsibility for the OEM's role in the pre-repair test: there is no evidence that the pre-repair test is where things went wrong.

2. Oversight of the Repairs

NASSCO appears to argue, in general, that the Navy also agreed to provide oversight of its repairs of the SLAD throughout the performance of the contract (*see* app. br. at 23 ("As it pertains to the repair oversight, by filling in for NPCC, the Navy had an affirmative responsibility to ensure the appropriate plans were being utilized and that the parts were being properly installed . . .")). To the extent that this is meant to be an argument that the Navy made a wholesale agreement to fill in for NPCC for the entirety of the work on the SLAD and to be the guarantor of AIT's work, it is without any evidentiary basis and may be easily rejected on these grounds.[33]

3. Oversight of the Installation of the SLAD and Console

Perhaps the NASSCO argument about repair oversight is meant to be limited to the re-installation of the SLAD and the console and the errors that attended AIT's performance of these acts.[34] Indeed, much of its briefing discusses this in more detail

---

[33] It is also implausible: AIT's original purchase order with NPCC was for six days of technician work – far less than would be needed if the OEM were to oversee all of its repairs – making it far from likely that, even if the Navy agreed to undertake all the duties AIT originally intended for the NPCC that it would extend that far. In fact, AIT affirmatively declined Mr. Thompson's offer to be present for the repair work because it did not have the budget for it.

[34] Notably, this argument is inconsistent with NASSCO's factual contention that Mr. Thompson presided over the energizing of the panel on March 9 (a contention

21

(*see* app. br. at 23-24).  This argument fails because the Navy project manager made clear that the Navy was stepping in for the OEM technician grudgingly, and in a limited capacity – a limited capacity that cannot be read to carry the obligations that NASSCO seeks to impose upon it.

As discussed above in the Facts section, when NASSCO, at the last minute, informed the Navy project manager, Mr. Stevens, that NPCC would not be present for the installation of the console, his response was not that the Navy would take over; rather it was that this was unsatisfactory and that the Navy's role "will be for oversight only and will not replace the OEM."  Whatever Mr. Stevens meant by the rather hazy term, "oversight," it was clearly a lesser role than what NPCC would have provided under the contract, as was evident by the fact that he clearly stated that the Navy was "not replac[ing] the OEM" – an important phrase not addressed by NASSCO.  One thing he was certainly not doing was imposing upon the Navy the responsibility to guarantee AIT's work as NASSCO would now have it.

First, he never wrote that the Navy would be the guarantor of AIT's work, and to impose upon the Navy such a responsibility would be something of such significance that it cannot be implied from the record here.  Indeed, though it is commonplace for government inspectors to observe (perhaps even "oversee") work performed in government contracts (the nearest analogy we can find here), this observation on their part does not relieve the contractor of responsibility to do its work properly.  *Cf. Atterton Painting & Constr., Inc*., ASBCA No. 31471, 88-1 BCA ¶ 20,478 at 103,586-87 (citing and quoting cases for the proposition that the erroneous approval of contractors' work by government inspectors does not, by itself, constitute waiver by the government).

Second, even if Mr. Stevens had agreed to make the Navy responsible for AIT's work, NASSCO has not proved that Mr. Stevens had the authority to impose such a commitment upon the Navy.  The DO, in fact, provides that only the CO had authority to make changes to the contract and there is no evidence here that the CO adopted any such change.[35]

---

contrary to our findings):  the Navy could not be standing in for NPCC if NPCC were, in fact, there.

[35] NASSCO argues that Mr. Stevens's statement that the government should be refunded the money for the OEM to perform its duties for the installation of the console is evidence that the Navy was assuming those responsibilities, itself (app. br. at 23).  We read this more as a complaint that a service was not being provided than proof that the Navy was performing it.  More to the point, the Navy never did get the money back because the CO (the only person with authority to make a contract change on behalf of the government) never sought it.

22

## C. AIT and NASSCO are Responsible for any Problems with NPCC

The argument which NASSCO devotes most of its energy to advancing is that NPCC, being foisted upon it by the DO, was effectively a Navy agent and any problems to which NPCC contributed were thus problems for which the Navy should bear responsibility or, at the very least, for which NASSCO should be absolved of responsibility (app. br. at 25-30). To be sure, it dresses the argument in somewhat different clothing, arguing, as a general proposition that the Navy is responsible for any delays caused by a mandatory sole-source contractor (app. br. at 25-26); that NPCC's supposed ineffectiveness made timely performance impossible (app. br. at 27-28); and that the inclusion of NPCC as the OEM was a deficient specification on the part of the Navy (app. br. at 28-30), but it all comes down to a question of who is responsible for the performance of a subcontractor that is recognized by all to be the sole source available to perform the work. Lest there be any ambiguity: that responsibility here fell upon NASSCO.

Our analysis of the question begins with the general proposition that contractors are responsible for the work of their subcontractors as if it were done by them. This may be found in the FAR provision governing liquidated damages (*see* FAR 52.211-11(c) (applying the test for the contractor's responsibility is the same as in the default clause of the contract which, itself, states as much)) and is recognized by the law as discussed below. There are many good reasons for this, not the least of which is that it is the contractor who has privity with the subcontractor and can impose discipline upon the subcontractor if it is not performing. The government does not have that ability.

NASSCO argues that there should be an exception to this rule for circumstances where the government has essentially dictated who the subcontractor will be and cites *dicta* in a non-binding concurrence-in-result in a Board decision from 1967 that a contractor "might well be relieved of responsibility" for the late delivery of an item in such circumstances (*see* app. br. at 25 (citing *Bromion, Inc.*, ASBCA No. 12075, 67-2 BCA ¶ 6543 at 30,403 (Spector, J., concurring in result))). It also cites *dicta* in a trial judge's decision adopted by the Court of Claims for a similar proposition (*see* app. reply br. at 23 (citing *Franklin E. Penny Co. v. United States*, 524 F.2d 668, 676 (Ct. Cl. 1975)) and a 1975 case from the Department of Commerce Board of Contract Appeals that it concedes is "not completely analogous" (*see* app. br. at 26 (citing *Electro-Nav, Inc.*, DCAB No. NOAA-1-74, 75-1 BCA ¶ 11,162)). These cases (and one other case from NASSCO's reply brief that we will discuss later) do not make a very persuasive case.

We dispose of the last case first, given that NASSCO concedes that it is not directly on point as it involved a warranty that a part was available on the open market when it was not, and, being from the Department of Commerce Board of Contract Appeals, it is not binding upon us in any event. Similarly, the concurrence in *Bromion* is not binding upon us because it is a concurrence-in-result and the Board's practice is that

concurrences-in-result do not establish binding precedent. Moreover, the cited portion of the *Bromion* concurrence-in-result and the cited portion of the *Franklin E. Penny* decision from the Court of Claims are both *dicta* from more than 40 years ago. They do not engage in any analysis, offer any rationale, or cite any law in support of their statements. Other binding decisions directly on point, however, come to a different conclusion and demonstrate the speculative opinions voiced in the cases cited by NASSCO to be outliers which the law has passed by.

In 1964, three years before *Bromion*, in *Federal Television Corp.*, ASBCA No. 9836, 1964 BCA ¶ 4,392, we squarely rejected an argument that the prime contractor was not responsible for the behavior of a subcontractor that was the sole source available as a result of the government's requirements, quoting the default clause and noting that the clause "contains no exception based upon the subcontractor being a sole source." 1964 BCA ¶ 4,392 at 21,217. *Federal Television* was cited with approval for this proposition by the Board in *Fuller-American, a Joint Venture*, ASBCA No. 19629, 75-2 BCA ¶ 11,438 at 54,514.

The next significant decisions from us on this subject matter after the *Bromion* concurrence came in two opinions issued within two months of each other in 1974: *Therm-Air Mfg. Co.*, ASBCA No. 17128, 74-2 BCA ¶ 10,652, and *Datametrics, Inc.*, ASBCA No. 16086, 74-2 BCA ¶ 10,742. *Therm-Air*, which was first, involved a contract which, for all practical purposes, required the use of air compressors made by a single company, Carrier. We recognized that appellant's bargaining power with Carrier was "limited," but nevertheless denied it relief because, "[d]oing business with Carrier was a risk which appellant assumed when it undertook its contract with the government, and this risk included the possibility of failures attributable to vendor workmanship deficiencies." 74-2 BCA ¶ 10,652 at 50,583. *Datametrics*, coming shortly thereafter, acknowledged the difficulty a sole-source subcontractor might impose upon the prime contractor, but came to the same conclusion as *Therm-Air*, denying relief:

> Here appellant has complained that at times it was delayed and incurred increased costs because its [sole source] suppliers delivered unsatisfactory items. The evidence supports this contention . . . . However, under the circumstances the problem is solely between appellant and the suppliers. The government has no privity of contract with the subcontractors and has no control over them. Appellant has both. We are not unmindful that our decision in this regard may seem to ignore the economic power which a "sole source" wields, or at least may wield, if it desires to do so. We do not ignore this fact, but rely instead upon the proposition that it is a fact of life that this disparity in bargaining power exists; and that no contractor is forced to

24

accept a contract containing designated "sole sources."  The contractor can and should make its contract with the supplier in such a fashion that the contractor has recourse against the supplier for the furnishing of improper items . . .

74-2 BCA ¶ 10,742 at 51,102 (citing *Therm-Air*, 74-2 BCA ¶ 10,652).

The law on the government's obligations involving sole-source suppliers has continued to move in a different direction than NASSCO argues.  In *Alabama Dry Dock & Shipbuilding Corp.*, ASBCA No. 39215, 90-2 BCA ¶ 22,855, we stated that, "[w]e consider the law clear that when the Government directs use of a sole source it represents only that the requirement of the contract can be met by use of the item and not that the item will be properly manufactured or delivered on time. . . . If appellant suffered damages as a result of the late delivery or improper manufacture . . . its recourse is against [the sole-source supplier], not the Government."  90-2 BCA ¶ 22,855 at 114,811-12 (citing *Cascade Electrical Co.*, ASBCA No. 28674, 84-1 BCA ¶ 17,210 at 85,682-83, and *Environmental Tectonics Corp.*, ASBCA No. 21657, 79-1 BCA 13,796 at 67,578).  This statement of law in *Alabama Dry Dock & Shipbuilding* was quoted with approval in the more recent case of *Demusz Mfg. Co.*, ASBCA No. 55311, 07-1 BCA ¶ 33,463 at 165,884.

Ironically, NASSCO cites our case of *S-Tron, Inc.*, ASBCA No. 45890, 94-3 BCA ¶ 27,249, in its reply brief for the notion that the government is responsible for problems with sole source contractors (app. reply br. at 23).  But the case does not say this.  Rather, *S-Tron* follows the statement of law discussed above from *Alabama Dry Dock & Shipbuilding*, citing yet another case of ours for the proposition that, when the government designates a sole source for supplies or materials, "it warrants only that the source has the ability to produce the product, not that it will, or will do so without defect."  *S-Tron*, 94-3 BCA ¶ 27,249 at 135,777 (quoting *Salisbury Special Tool Co.*, ASBCA No. 37530, 89-2 BCA ¶ 21,838 at 109,873).

Although these cases (including all those cited by NASSCO) involve the supplier of parts, as opposed to services as presented in our facts, the reasoning would be identical if applied to a sole-source provider of services.  Indeed, such was the case in *General Ship Corp. v. United States*, 634 F.Supp. 868 (D. Mass. 1986), in which the district court addressed a dispute involving a contract which specified the use of an identified subcontractor for work on a ship.  In that decision, the court applied much of the law discussed above and concluded that, in a subcontract for repair services, the most that could be imposed on the government was a warranty that the subcontractor was capable of performing the work.  634 F.Supp. at 869-70.  Though the case is not binding upon us, we find it persuasive authority, consistent with our reasoning.  Thus, with the exception of the warranty that the sole-source supplier identified by the government is capable of performing the work, the government makes no other warranties when such a

subcontractor is identified by contract, and the prime contractor is as responsible for that subcontractor's work as it would be any other subcontractor. Given the limits of that warranty, the government is not liable for the acts or omissions of a sole-source contractor who, though capable, does not meet the performance needs of the prime and the identification of such a sole source contractor would not make a deficient specification for which the government is liable. And, NASSCO does not argue that NPCC was not *capable* of performance, perhaps because NPCC completed the job at NASSCO's behest when AIT was sidelined in late March.

### D. The Delays Were AIT's Fault, not NPCC's, in any Event

Even if the law were different, and NPCC were effectively an agent of the government, we would still find for the Navy since the missteps were, as a matter of fact, the fault of AIT. To draw this conclusion, we need go no further than NASSCO's own internal documents which, as discussed at greater length above, squarely cast the blame on AIT. The fried motherboard? According to NASSCO, this was AIT's fault for not getting the wiring diagram before proceeding.[36] The improper brake installation? Again, according to NASSCO, the responsibility for this rests upon AIT for its technician installing it in a rush. Despite bringing this appeal, NASSCO has never disavowed these conclusions nor expressed regret that it had NPCC complete the work. To be sure, there were other problems with the SLAD: the solenoids, the leaking hydraulic cables, and the leaky drum, but NASSCO has produced no evidence assessing blame for these problems on anybody besides itself, much less blame on NPCC. In the absence of such evidence, NASSCO could not meet its burden of proof that the fault lied with NPCC – even if that conclusion would absolve NASSCO, which it would not.

### III. The Liquidated Damages Clause and its Application was Appropriate

NASSCO's final set of arguments challenges the use of the liquidated damages clause here. In particular, NASSCO argues that the $32,675 per day cost was so high as to not reflect a reasonable estimation of the damages to the Navy and that, since the ship was "99%" complete and the Navy "had access to 99% of the ship", this was particularly so (app. br. at 31). NASSCO further argues that because the SRA was extended until May 9, 2017, the delay did not damage the Navy at all and should thus pay no damages (*id*. at 31-32). NASSCO's arguments reflect a misunderstanding of what both liquidated damages and warships are for.

---

[36] Though AIT may blame NPCC for not giving it the wiring diagram beforehand (*see* app. br. at 23; app. reply br. at 13), it has produced no evidence that it sought the diagram and was refused by NPCC.

## A.    What Makes a Permissible Liquidated Damages Clause

A liquidated damages clause is enforceable as long as "'the amount stipulated for is not so extravagant, or disproportionate to the amount of property loss, as to show that compensation was not the object aimed at or as to imply fraud, mistake, circumvention or oppression.'" *DJ Mfg. Corp. v. United States,* 86 F.3d 1130, 1133 (Fed. Cir. 1996) (quoting *Wise v. United States,* 249 U.S. 361, 365 (1919)); *see also K-Con Bldg Sys., Inc. v. United States*, 778 F.3d 1000, 1008 (Fed. Cir. 2015); *Weis Builders, Inc.*, ASBCA No. 56306, 10-1 BCA ¶ 34,369 at 169,721.  Similar proscriptions may be found in FAR 11.501(b), cited by NASSCO (*see* app. br. at 30).  *See K-Con*, 778 F.3d at 1008 (including a citation to FAR 11.501(b) amongst other authorities in support of the general statement of the law).  A fair summary of the law is that liquidated damages clauses are perfectly allowable so long as they do not appear to have been designed as a punishment for late performance but, instead, reflect an attempt to place a value on late performance in circumstances where ascertaining that value would be otherwise difficult, if not impossible.  *See DJ Mfg.*, 86 F.3d 1130; *K-Con*, 778 F.3d 1000; *Weis Builders,* 10-1 BCA ¶ 34,369.

Indeed, liquidated damages clauses (which, of course, the contractor has agreed to) are such a rational response to uncertain damages that (at least in the federal system):

> A party challenging a liquidated damages clause bears the burden of proving the clause unenforceable. . . . That burden is an exacting one, because when damages are uncertain or hard to measure, it naturally follows that it is difficult to conclude that a particular liquidated damages amount or rate is an unreasonable projection of what those damages might be.

*DJ Mfg. Corp.*, 86 F.3d at 1134 (citations omitted).

## B.    The Liquidated Damages Clause Here was Reasonable

It cannot be gainsaid that the purpose of a guided missile destroyer, like the *Bulkeley*, is to project American sea-power and that it does not do that very effectively when it is tied up to a pier in Norfolk, Virginia and cannot go to sea.  How valuable that projection of power by a single guided missile destroyer is, is necessarily immeasurable,[37]

---

[37] This makes it the kind of contract well-suited for a liquidated damages clause.  *See Priebe & Sons v. United States*, 332 U.S. 407, 411 (1947) (cited by *DJ Mfg. Corp.*, 86 F.3d at 1133).  Indeed, the value of the timely delivery of a naval warship was a classic case supporting the use of liquidated damages referenced by the Federal

but one way to gauge it is to consider what the Navy is willing to pay for it. That amount would surely include the salaries of the *Bulkeley*'s officers and crew as well as its capital and other operational expenses, which would be significant. Hence, setting liquidated damages at the salary of the *Bulkeley*'s crew strikes us as a measured way of recovering a portion (and only a portion) of the value that the Navy has assigned to operational access to the ship. The clause's limitation of damages to only 10% of the value of the DO only serves to make it more reasonable.

C. Liquidated Damages are Appropriate Even if the *Bulkeley* did not Immediately go to sea After Substantial Completion of the DO and Even if the Overhaul Was Largely Complete at the Delivery Date

NASSCO argues that since the overhaul was "99%" complete by the DO's (revised) delivery date, it should effectively be considered substantially complete at this time (app. br. at 31). A major flaw in this argument is that, according to NASSCO's own submission to the Navy in CFR 376, dated March 16, 2017, the *Bulkeley* was not ready for the sea trials apparently scheduled for the next day[38] because of problems with the SLAD. Thus, NASSCO recognized that an inoperative SLAD meant that the *Bulkeley* would not be ready for sea trials. And since the sea trials were a critical last step before the end of the SRA, [39] the inability to perform them kept the *Bulkeley* from being available to the fleet when required. When a contract requires the return of a ship capable for sea duty, it cannot be said to be substantially complete if the ship is unavailable for that purpose, no matter what percentage of the work is done.[40]

To the extent that NASSCO argues that there were no damages because the sea trials wound up taking place sometime after it completed its work on the *Bulkeley*, and thus the Navy was not harmed (*see* app. br. at 31-32), the argument founders on two shoals: first, the evidence before us in the form of CFR 376 implies that, had NASSCO

---

Circuit in *DJ Mfg. Corp*. *See* 86 F.3d at 1137 (citing *United States v. Le Roy Dyal Co.*, 186 F.2d 460, 463 (3d Cir. 1950)).

[38] Except for CFR 376, the record does not tell us much about when the sea trials were scheduled and what effect NASSCO's delays in completing the work on the SLAD had upon the Navy's ability to schedule sea trials after that date.

[39] Accomplishing the sea trials, in fact, is required by SLIN 0001BA. To NASSCO's apparent benefit, the Navy did not require completion of the sea trials before halting the accumulation of liquidated damages.

[40] Thus NASSCO's citation on page 31 of its opening brief to our decision in *Dick Pacific Constr. Co., Ltd.*, ASBCA No. 57675, *et al.*, 16-1 BCA ¶ 36,196, is inapposite. In *Dick Pacific*, discrete, easily divisible portions of the project were complete and available for full use and, in the very limited facts presented by that case, we held that the liquidated damages clause should have broken out the damages with that potentiality in mind. *See id*. That is not the case here.

28

completed its work on time, the Navy was set to perform a sea trial on March 17, 2017. Second, and conclusively, it is black-letter law that the reasonableness of a liquidated damages clause is determined at the time that the parties enter the contract and that it is enforceable even if no damages are, in fact, incurred. *See, e.g., Downing Electric, Inc.*, ASBCA No. 37851, 90-3 BCA 23,001 at 115,504 (citing *Priebe & Sons, Inc. v. United States*, 332 U.S. 407 (1947)). We perceive this as part of the bargain that the parties have struck: they have agreed that the government is not at liberty to increase damages beyond those that the liquidated damages clause imposes, regardless of the circumstances, and that neither may the contractor cite changed circumstances to reduce them. With this law in mind, it is immaterial whether the Navy would have actually been ready to put the *Bulkeley* to sea the minute the DO was scheduled to be completed; what was important under the terms of the liquidated damages clause was that the work on the *Bulkeley* was not completed when required by the contract.

CONCLUSION

The evidence supports a finding that NASSCO completed its work under the DO late by at least the 11 days for which the Navy exacted the compensation under the liquidated damages clause. The fault for this delay lies completely with NASSCO and its subcontractor, AIT. To the extent that NPCC bore any responsibility for the delay (which it did not), by law, the responsibility for NPCC's missteps lies with AIT and NASSCO. Moreover, the liquidated damages clause was reasonable and lawfully applied. This appeal is denied.

Dated: March 29, 2022

J. REID PROUTY
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

MARK A. MELNICK
Administrative Judge
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 62221, Appeal of Metro Machine dba General Dynamics NASSCO-Norfolk, rendered in conformance with the Board's Charter.

Dated:  March 29, 2022

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals